**WILK AUSLANDER LLP**
1515 Broadway, 43rd Floor
New York, New York 10036
Telephone: (212) 981-2300
Eric J. Snyder, Esq.
Eloy A. Peral, Esq.

*Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                              :
                                                    : Chapter 11
                                                    :
MANHATTAN JEEP CHRYSLER DODGE, INC., *et al.*,[1]   :
                                                    : Case No. 18-10657(MEW)
                              Debtors.   :
                                                    : (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365,
AND FED. R. BANKR. P. 2002, 6004, 6006, AND 9019 FOR, *INTER ALIA*,
APPROVAL OF: (I) (A) BIDDING PROCEDURES, (B) STALKING
HORSE ASSET SALE AGREEMENT AND BID PROTECTIONS, (C)
FORM AND MANNER OF NOTICE OF AUCTION, SALE
TRANSACTION, AND SALE HEARING, (D) ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (E) REJECTION PROCEDURES;
AND (II) APPROVING (A) SALE OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS, AND ENCUMBRANCES, (B) ASSUMPTION AND
ASSIGNMENT OR REJECTION OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (C) APPROVING
<u>COMPROMISE BETWEEN THE DEBTORS, FCA AND ALLY</u>**

---

[1] The last four digits of each Debtor's taxpayer identification number are as follows: Manhattan Jeep Chrysler Dodge, Inc. (2520); Manhattan Automotive, L.L.C. (3993). The Debtors' addresses are 678 Eleventh Avenue, New York, NY 10019 and 629 West 54th Street, New York, NY 10019, respectively.

Manhattan Jeep Chrysler Dodge, Inc. d/b/a Manhattan Jeep Chrysler Dodge RAM ("Manhattan JCDR") and Manhattan Automotive, LLC d/b/a Alfa Romeo Fiat of Manhattan ("Manhattan ARF") (collectively, the "Debtors"), by and through their counsel Wilk Auslander, LLP, submit this motion (the "Sale Motion"), pursuant to sections 105(a), 363, 365, and 507 of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking the entry of: (I) an Order (the "Bidding Procedures Order") in substantially the same form as attached hereto as **Exhibit A**, (A) scheduling a sale date for the sale (the "Sale") of substantially all of the Debtors' tangible and intangible assets ("Assets") in one or more lots; (B) approving the Stalking Horse ASA (as defined below), copy of which is attached hereto as **Exhibit B**; (C) approving certain bid protections in favor of the Stalking Horse (as defined below), including the Break-Up Fee and the Expense Reimbursement (as those terms are defined below and in the Stalking Horse ASA); (D) approving bidding procedures (the "Bidding Procedures"), a copy of which is attached to the Bidding Procedures Order as **Exhibit 1**; (E) approving the form and manner of notice of the Sale (the "Sale Notice"), a copy which is attached to the proposed Bidding Procedures Order as **Exhibit 2**; (F) approving procedures for the assumption and assignment of the Debtors' executory contracts and unexpired leases and the determination of cure costs (the "Assumption and Assignment Procedures") and the form and manner of notice thereof (the "Assumption Notice"), a copy of which is attached to the Bidding Procedures Order as **Exhibit 3**; and (G) approving procedures for the rejection of certain of the Debtors' executory contracts and unexpired leases (the "Rejection Procedures") and the form and manner of notice thereof (the "Rejection Notice"), a copy of which is attached to the Bidding Procedures Order as **Exhibit**

**4**; and (II) a second Order (the "<u>Sale Order</u>"[2]) approving (A) the sale of the Assets to the holder

or holders of the highest or otherwise best bid for the Assets, free and clear of any and all liens,

claims, encumbrances and other interests (collectively, as "<u>Interests</u>") (with such liens, claims

and encumbrances to attach to the proceeds of such sale); (B) the assumption and assignment of

certain executory contracts and unexpired leases; and (C) the Stalking Horse Stipulation (as

defined below), a copy of which is attached hereto as **Exhibit C**. In support of their Sale Motion,

the Debtors submit the *Declaration of Patrick Monninger In Support of the Sale Motion* attached

hereto as **Exhibit D**, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Prior to and since the filing of the Chapter 11 petitions, the Debtors' management

and professionals have been singularly consumed with securing a purchaser for a going concern

sale that is supported by the estates' critical constituents.  During the last five months, the

Debtors' have negotiated with several potential purchasers and have explored a variety of

transactions, all the while balancing the interests of these constituencies.  At various stages in the

process, there was a real possibility that the Debtors would cease operating, which would have

caused the complete loss of the Debtors' goodwill value and the termination of the Debtors' entire

work force.

2.      Through this Sale Motion, the Debtors seek approval of a stalking horse bid for

substantially all of the Assets and to implement a Sale process that is supported by the estates'

most important stakeholders – the Debtors' landlord (FCA Realty), their franchisor (FCA US),

and their principal lender (Ally) – and that will result in a 100 percent distribution to Manhattan

---

[2] A copy of the Sale Order will be provided to interested parties prior to the hearing at which the Debtors will seek approval of the sale of the Assets.

01043997.3

ARF's creditors and a substantial, and possibly 100 percent, distribution to Manhattan JCDR's

creditors.  In addition, the Sale will ensure the continued employment of the Debtors' employees.

3.     The involvement of the FCA Entities and Ally in the Sale process goes beyond

mere approval of the stalking horse. In addition to the typical relief sought herein, the Debtors

also seek approval of the Stalking Horse Stipulation (as defined below) between the Debtor, the

FCA Entities, and Ally. The Stalking Horse Stipulation binds the FCA Entities and Ally to the

success of the Sales process and aligns their interests with the estates' interests. In the Stalking

Horse Stipulation, the FCA Entities and Ally have agreed to provide substantial consideration

and benefits, including a steep reduction in their claims, that will facilitate a Sale and which

significantly enhance the value of the stalking horse bid to the Debtors' estates.  For the

foregoing reasons and as further detailed below, the Debtors respectfully requests that the Court

grant the relief requested herein.

## I.  BACKGROUND

### a.  General Background

4.     On March 9, 2018 (the "Petition Date"), each of the Debtors filed voluntary

petitions for relief under Chapter 11 the Bankruptcy Code.

5.     The Debtors are managing their property as debtors-in-possession pursuant to §§

1107(a) and 1108 of the Bankruptcy Code and no trustee, examiner, or committee of creditors

has been appointed in these cases.

6.     The Debtors are franchisees of the "Fiat Chrysler" group of automobile brands

referenced above and operate automobile retail dealerships in New York City. The Debtors are

under common ownership and management as more particularly described in the *Declaration of*

01043997.3

*Patrick Monninger (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration") [ECF No. 7].

7.      The Debtors commenced these chapter 11 cases to stay the acts of the Debtors' principal secured lender, Ally Financial, Inc. f/k/a GMAC and Ally Bank f/k/a GMAC Bank ("Ally") and in light of their liquidity issues, both of which hampered the Debtors' ability to continue to operate as going concerns. In order to preserve and maximize the value of their estates, the Debtors filed these chapter 11 cases to pursue an expeditious sale of the Assets, including their franchise rights. Additional description of the Debtors' businesses and the reasons for commencing these chapter 11 cases are set forth in First Day Declaration.

### b.  *The Dealerships*

8.      FCA US, LLC ("FCA US"), the Debtors' franchisor, is the North American subsidiary of Fiat Chrysler Automobiles, N.V., the global automobile manufacturer that produces, distributes, and markets the brand vehicles, parts, accessories and other products sold by the Debtors (collectively, as the "FCA Products"). FCA US is the exclusive distributor and franchisor of FCA products in North America.

9.      Manhattan JCDR operates a retail dealership of the Jeep, Chrysler, Dodge, and RAM automobile brands (the "JCDR Dealership"). The JCDR Dealership is operated in accordance with separate Jeep, Chrysler, and Dodge[3] Dealer Agreements, including FCA Corporation Sales and Service Agreement Additional Terms and Provisions, between Manhattan JCDR's predecessor in interest, Manhattan Jeep Eagle, Inc., and various of FCA US's predecessors in interest (collectively, as the "JCDR Dealer Agreements").[4]

---

[3] The Dodge Dealer Agreement covers the RAM brand.

[4] FCA US and FCA Realty are successors of or affiliates to New CarCo Acquisition, LLC ("New CarCo") that was formed by Fiat S.p.A to acquire substantially all of the assets of Chrysler, LLC, who filed a chapter 11 petition on

10.     The JCDR Dealership is located at 678 Eleventh Avenue, New York, New York

("JCDR Facility") where it sells new and used vehicles. Manhattan JCDR leases the premises

located at the JCDR Facility from FCA Realty, LLC ("FCA Realty," and together with FCA US,

"FCA Entities"), an affiliate of FCA US, under a *Dealer Lease and Sublease* dated April 11,

2014 (as twice amended) (the "JCDR Lease").[5] Manhattan JCDR also subleases (the "JCDR

Sublease") a portion of the ARF Facility (as defined below) where it maintains its service

facility. The JCDR Lease expired on April 30, 2018.

11.     Manhattan ARF operates a dealership of the Alfa Romeo and Fiat brands (the

"ARF Dealership"). The ARF Dealership is operated in accordance with separate Fiat and Alfa

Romeo Dealer Agreements, including FCA Corporation Sales and Service Agreement Additional

Terms and Provisions, between ARF and FCA US's predecessor in interest, Chrysler Group,

LLC (collectively as the "ARF Dealer Agreements" with the JCDR Dealers Agreement,

collectively as the "Dealer Agreements").

12.     The Dealer Agreements grant FCA US the "right of refusal" with respect to any

offer to purchase the Assets on the same terms as the proposal.[6]

13.     The ARF Dealership is located at 629 West 54th Street, New York, New York,

where it sells new and used vehicles and maintains its service department (the "ARF Facility").

ARF subleases the premises located at the ARF Facility from FCA Realty under a *Dealer

Sublease* dated April 11, 2013 (as twice amended) (the "ARF Subsease" with the JCDR Lease

---

April 30, 2009. *See generally In re Chrysler LLC*, 405 B.R. 84, 90 (Bankr. S.D.N.Y.) (subsequent history omitted).
As part of the sale, Old CarCo assumed the JCDR Dealer Agreements and assigned them to New CarCo. *See In re
Old CarCo, LLC (f/k/a Chrysler, LLC)*, 09-50002(SMB) (ECF Nos. 797, 3232).

[5] The Dealership Leases were also assumed and assigned as part of the sale to New CarCo. *See* note 5 *supra*; ECF
No. 1996.

[6] Copies of the Dealer Agreements are included with the *Motion FCA US LLC For Relief From the Automatic Stay
To Terminate Executory Contracts Under 11 U.S.C. § 362(d)* [ECF No. 32].

01043997.3

and the JCDR Sublease, collectively as the "Dealership Leases"). The ARF Subleases expired on April 30, 2018.

14.     On April 4, 2018, FCA Realty filed a proof of claim (No. 5-1) asserting a general, unsecured claim against the Debtors in the aggregate amount of $1,265,544.36[7] for amounts owed under the Dealership Leases prior to the Petition Date (the "FCA Realty Pre-Petition Claim"). The aggregate base monthly rent under the Dealership Leases total $185,000.00.

15.     The Debtors have not made any payments to FCA Realty during the bankruptcy. As of September 17, 2018, the target date to close under the Stalking Horse ASA (defined below), FCA Realty's post-petition claim under the Dealership Leases will equal no less than $1,345,000 (the "FCA Realty Post-Petition Claim", with the FCA Realty Pre-Petition Claim collectively, as the "FCA Realty Claims").

### c.  Ally's Secured Claim

16.     On or about August 19, 2009, JCDR's predecessor-in-interest, Manhattan Jeep Eagle, Inc., GMAC, predecessor-in-interest to Ally Financial, Inc. and GMAC Bank, predecessor-in-interest to Ally Bank, entered into various agreements (the "Floorplan Agreements")[8] under which GMAC and GMAC Bank financed Manhattan JCDR's purchase of new and used vehicles and which granted GMAC and GMAC Bank a lien and security interest in all assets of the Debtors, including Manhattan JCDR's inventory of vehicle and parts, to secure the repayment of the Debtors' obligations under the Loan Documents (as defined in the Second Interim Cash Collateral Order).  On or about February 18, 2011, Manhattan ARF was added to the Floorplan Agreements.

---

[7] FCA Realty's proof of claim does not breakdown the amounts allegedly owed by each Debtor.

[8] The Floorplan Agreements are specifically listed in the Second Interim Cash Collateral Order (defined below), as well as the other "Loan Documents" referenced in the order.

01043997.3

17.    The Debtors have also entered into certain Master Retail-Lease Agreements (the "Ally Retail Agreements) under which Ally may purchase and take assignment of motor vehicle retail installment sale and lease contracts that the Debtors enter into with their customers.

18.    On or about January 30, 2018, the Debtors and Ally entered into a Cross Collateral, Cross Default and Guaranty Agreement.

19.    According to the proofs of claim filed by Ally against the Debtors, as of the Petition Date Ally was due $13,918,795.25 on account of the Loan Documents with Manhattan JCDR (claim no. 41) and $7,932,907.35 on account of the Loan Documents with Manhattan ARF (claim no. 10).

20.    The amounts owed to Ally as of the Petition Date included approximately $634,000.00 (the "SOT Amount")[9] on account of vehicles that were "sold out of trust." A vehicle is SOT when a dealership does not remit to a floorplan lender, as required by the loan documents, upon the sale of a vehicle the amount needed to repay the advances ("Advances") by the lender that the dealer used to purchase the vehicle from its seller.

21.    On March 13, 2018, the Court entered the *Interim Order Granting Motion for Use of Cash Collateral and Adequate Protection and Related Relief* [ECF No. 12] (the "Interim Cash Collateral Order") and on March 25, 2018, the Court entered a *Second Interim Order Granting Motion for Use of Cash Collateral and Adequate Protection and Related Relief* [ECF No. 25] (the "Second Interim Cash Collateral Order").

22.    In the Second Interim Cash Collateral Order, Ally and the Debtors agreed that the "proceeds of the sale, net of any funds necessary to satisfy previous liens on the [vehicles that were not currently the subject of an advance by Ally] shall be distributed fifty (50%) percent to Ally and fifty (50%) percent to the Debtors." (the "Nonfloored Vehicle Proceeds") (Or.

---

[9] The precise SOT Amount is based on the Debtors' estimate and is not itemized in Ally's proofs of claim.

¶4(b)(2).) Ally's share of the Nonfloored Vehicle Proceeds (as well as the proceeds of the sale of
"floored" vehicles) are "first to be applied to the outstanding principal amount of the Advance of
the Vehicle sold, if applicable, and any excess and other amounts shall be applied first to
outstanding unpaid principal balances of Advances on Vehicles sold prepetition, and then, if any,
to other principal obligations under the Loan Documents." (*Id*. ¶4(b)(5).) Ally's receipt of its
share of the Nonfloored Vehicle Proceeds pursuant to the Second Interim Cash Collateral Order
has contributed to the reduction of the SOT Amount to zero.

23.    On June 28, 2018 [ECF No. 70] and July 16, 2018 [ECF No. 73], the Court
entered third and fourth interim cash collateral orders extending the terms of the Second Interim
Cash Collateral Order, whose terms expire on August 31, 2018.

### d.  Claims Against the Debtors

24.    On October 19, 2017, the Court entered an order establishing May 23, 2018, as
the deadline for non-governmental units to file proofs of claim in these Chapter 11 cases and
September 5, 2018 as the deadline for governmental units to file proofs of claim [ECF No. 35].

25.    The amount of unsecured claims filed timely against Manhattan JCDR and
Manhattan ARF equal approximately $4.5 million and $77,000, respectively.  The amount of
priority claims filed against Manhattan JCDR and Manhattan ARF equal approximately $1.2
million and $28,000, respectively.[10]

### e.  Marketing Efforts

26.    At the beginning of 2018, the Debtors began to explore a sale of the Assets as a
result of mounting liquidity problems. The Debtors retained D.T. Murphy & Company, LLC
("Murphy"), an automobile dealership broker with over 28 years of experience, to market the

---

[10] The total claims asserted by FCA Realty against Manhattan ARF are not included in these amounts. As stated in
note 7 above, FCA Realty's proof of claim does not break down what amounts are owed by each Debtor.

01043997.3

Assets and locate a buyer. As a result of the Debtors' marketing efforts, Jonathan Sobel, the

principal of the Stalking Horse and the principal of the Jeep Chrysler Dodge RAM dealership in

Southampton, New York, displayed serious interest in purchasing the Assets of Manhattan

JCDR. Mr. Sobel was prepared to submit an offer for approximately $3 million but FCA

indicated that it would not consent to the sale of those Assets to Mr. Sobel.

27.     The Debtors' efforts to identify a buyer continued unabated after the Petition

Date.  Initially, the Debtors and FCA US engaged in negotiations for FCA US's direct purchase

of the Assets and the parties were at one point on the verge of signing a non-binding term sheet.

However, FCA US's commitment to a deal was dependent on securing a replacement dealer for

the Manhattan dealerships. During this time, FCA US was in negotiations with the principal of

the Jeep Chrysler Dodge RAM dealership in Brooklyn, New York.  However, FCA US and the

principal of the Brooklyn dealership were unable to reach an agreement.

28.     The Debtors believe that through their extensive pre and postposition marketing

efforts, they have reached the entire universe of potential purchasers with the resources,

qualifications, and experience in the retail automotive industry necessary to purchase and operate

the dealerships.  Therefore, the Debtors believe that the Stalking Horse Bid, coupled with the

other consideration of substantial value (detailed below) that the Debtors will receive if they

close with the Stalking Horse, represent an accurate fair market value for the Assets.

*Remainder of Page Left Intentionally Blank*

01043997.3

## II.  **THE PROPOSED SALE**

### a.  *The Stalking Horse ASA and the Bid Protections*[11]

29.      In an Asset Sale Agreement dated August 9, 2018 (the "Stalking Horse ASA"), an entity controlled by Mr. Sobel, Bibendum Holdings, LLC (the "Stalking Horse "), agrees to purchase the Assets, including the Debtors' franchise rights under the Dealer Agreements (and applicable nonbankruptcy law) and other operating assets (the "Purchased Assets") (*see* § 1(a)), not including the Excluded Assets[12] (*see* § 1(b)).

30.      The Purchase Price under the Stalking Horse ASA equals: (a) the Fixed Cash Consideration ($3,240,000); (b) the Motor Vehicle Consideration; (c) and the Other Inventory Consideration.  *See* § 2. The latter two components of the Purchase Price is the value of the Debtors' inventory of motor vehicles and parts and accessories (the "Inventory") that the Stalking Horse will select to purchase.  The Stalking Horse ASA allocates 80 percent of the Fixed Cash Consideration ($2,592,000) to the Purchased Assets owned by Manhattan JCDR, which amount shall be payable to Manhattan JCDR, and allocates the remaining 20 percent ($648,000) to the Purchased Assets owed by Manhattan ARF. The allocation of the Fixed Cash Consideration among the Debtors is based on each Debtor's average yearly vehicle sales as a percentage of the Debtors' total combined sales, *i.e.*, Manhattan JCDR provides approximately 80 percent of the Debtors' total sales and Manhattan ARF provides the remaining 20 percent.

31.      The proceeds of the sale of the Inventory will be encumbered by Ally's liens pursuant to the Loan Documents and will be used to repay Advances owed to Ally and to

---

[11] The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse ASA. In the event of any inconsistencies between the provisions of the Stalking Horse ASA and the terms set forth herein, the terms of the Stalking Horse ASA will govern.

[12] Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Stalking Horse ASA.

01043997.3

otherwise pay and be applied to Ally's secured claim. Thus, it is not expected that the sale of the

Inventory will generate any net proceeds to the estate.

32.     As elaborated below, the consideration that the Debtors will realize under the

Stalking Horse ASA is significantly enhanced by several factors, including an agreement

contained in the Stalking Horse Stipulation between the Debtors, Ally, and the FCA Entities.

33.     The Stalking Horse ASA (*see* § 26) requires that the Debtors seek approval of the

following bid protections in favor of the Stalking Horse (collectively, as the "Bid Protections"):

- A break-up fee in the amount of $97,200 equal to 3 percent of the Fixed Cash Consideration (the "Break-Up Fee") payable from the proceeds of a closing if (i) the Stalking Horse is not the prevailing bidder; and (ii) the Stalking Horse is not in material breach of any obligation under the Stalking Horse ASA;

- Reimbursement of the Stalking Horse's reasonable due diligence and legal fees, up to an additional $64,800 equal to 2 percent of the Fixed Cash Consideration, for a total maximum fee and expense reimbursement of $162,000 or 5 percent of the Fixed Cash Consideration ("Expense Reimbursement") ;

- In the event that FCA US exercises its right of first refusal as to the Stalking Horse, the amount paid by FCA US or its assignee will be $3,402,000, such amount being equal to the sum of the Fixed Cash Consideration plus the Break-Up Fee and Expense Reimbursement; and

- The Bidding Procedures provide that the next highest qualified bid contain total consideration equivalent to an amount at least $100,000 greater than the Purchase Price (the "Overbid Amount").

34.     The Stalking Horse ASA provides that the Stalking Horse will pay Murphy a

consulting fee of 5 percent of the Fixed Cash Consideration upon Closing.  Murphy was not

retained by the Debtors after the Petition Date and therefore, regardless of the Stalking Horse

ASA, is not entitled to any compensation from the Debtors of any kind.[13]

---

[13] To the extent any executory contract between the Debtors and Murphy did not terminate or expire prior to the Petition Date, the Debtors intend to reject such executory contract.

01043997.3

35.     Lastly, the Stalking Horse has the right to purchase certain executory contracts and unexpired leases listed on Schedule C. (ASA § 1(a)(iii).) The Stalking Horse may elect to purchase them prior to the Closing Date. Counsel for the Stalking Horse has conveyed that it does not intend to purchase any of the executory contracts or unexpired leases (other than potentially the Dealer Agreements to the extent that the Stalking Horse does not enter into new franchise agreements with FCA US).

> ### b.  *The Stalking Horse Stipulation and Other Issues Enhancing Value of the Stalking Horse Bid*

36.     There are several factors, including a stipulation between and among the Debtors, Ally, and the FCA Entities (the "Stalking Horse Stipulation"), that in the aggregate will have the effect of substantially increasing the value of the Stalking Horse ASA. Through this Sale Motion, the Debtors seek approval of the Stalking Horse Stipulation pursuant to Bankruptcy Rule 9019 to be considered at the Sale Hearing (defined below) scheduled for September 5, 2018.  The terms of the Stalking Horse Stipulation are, in addition to being summarized immediately below, discussed further in Part g below.

37.     First and foremost, under the Stalking Horse ASA, upon closing, FCA Realty has agreed to withdraw the FCA Realty Pre-Petition Claim ($1,265,544.36) and the FCA Realty Post-Petition Claim, which as of September 17, 2018, the expected "outside" closing date, will total at least $1,345,000.

38.     Second, the Stalking Horse has the discretion to select what Motor Vehicle Assets in the Inventory to purchase. (*See* ASA Sch. 2(b)-1.) Under the Stalking Horse Stipulation, the vehicles not purchased by the Stalking Horse will be reallocated by FCA US to other dealers or sold at auction (*i.e.*, these vehicle will be "diverted" by FCA US) (the "Diversion Vehicles").  As detailed below, the Stalking Horse or FCA US, as the case may be, will remit to Ally the price at

which the Debtors purchased vehicles from FCA US, *regardless* of the current fair market value for such vehicle, minus certain incentive payments (discussed further below) embedded in the manufacturer's price  that were previously repaid to the Debtors.

39.    As the Stalking Horse has selected not to purchase any 2017 model year ("MY") vehicles, FCA US will dispose of all of the 2017 MY vehicles in Inventory. FCA US estimates that the sale proceeds for 2017 MY vehicles will total $365,000 less than the amount owed to Ally on those Diversion Vehicles.  Moreover, prior to the expected closing date under the Stalking Horse ASA (September 17, 2018) 2018 MY vehicles will, by the end of October or sooner, depreciate in value by an average of five (5) percent simply due to the passage of time and the increase in the supply of 2019 MY vehicles.[14] Therefore, in the absence of FCA US's agreement in the Stalking Horse Stipulation to dispose of the Diversion Vehicles, either the Debtors will be left with depreciating assets in the form of previous MY vehicles or the Stalking Horse would be compelled to purchase the depreciating assets.

40.    In the absence of FCA US's agreement with respect to the Diversion Vehicles, the Stalking Horse would surely have offered a lower Fixed Cash Consideration to compensate for acquiring the depreciating vehicles. It is estimated that by the end of October, the Diversion Vehicles will depreciate in the aggregate amount of at least $680,000 ($365,000 for 2017 vehicles and approximately $315,000 with respect to the 2018 MY vehicles).[15]

---

[14] The depreciation of a particular vehicle will depend largely on its make and model. For example, Jeep Cherokees are expected to depreciate less than five percent while Alfa Romeos are expected to depreciate more than five percent.

[15]  As stated above, FCA US estimates that the shortfall between the proceeds of the 2017 MY Diversion Vehicles and the amount that must be repaid to Ally for these vehicles will be $365,000. The Debtors estimate that there will be about 160, 2018 MY Diversion Vehicles. If the average invoice amount for these vehicles is between $39,000 and $40,500, then these particular Diversion Vehicles will lose a total of about $315,000 in value (assuming a five percent depreciation rate by the end of October).

14

41.     Third, as noted above, under the Stalking Horse Stipulation, the Advances owed to Ally with respect to each Diversion Vehicle will be paid in full, regardless of the amount of the consideration that FCA US realizes upon the disposition of a Diversion Vehicle.  FCA US is required to pay Ally the price at which the Debtors originally purchased the Diversion Vehicle from FCA US (defined in the stipulation as the "Invoice Amount") minus the "(i) 'holdback,' (ii) supplemental floorplan payments and (iii) incentive payments with respect to the Vehicles" which is defined as the "Holdback Amount." (Stalking Horse Stip., Whereas Clause No. 5.) The "holdback" is the portion of the invoice amount (also referred to as the "MSRP") that is repaid to dealers and usually amounts to approximately four (4%) per cent of the invoice price.  The Debtors are required to pay Ally the Holdback Amount for the Diversion Vehicles and the Vehicles purchased by the Stalking Horse. (*Id*. ¶ 3.) Thus, the Stalking Horse Stipulation ensures that Ally will be paid with respect to each Vehicle an amount not less than the outstanding Floor Plan balance as of the Petition Date for such Vehicle.

42.     Accordingly, the benefit to the Debtors' estates of FCA US's disposition of the Diversion Vehicles is twofold: (1) it bolsters the Purchase Price under the Stalking Horse ASA because it relieves the estates of depreciating assets; and (2) it ensure that no deficiency claim for Ally arises from the disposition of depreciating collateral.

43.     Fourth, Ally has agreed to limit its claim to certain items set forth in its proof of claim and not to seek to recover post-petition amounts, including for attorneys' fees, the fees for "Car Sitters" referenced in ¶ 4(a) of the Cash Collateral Orders, and post-petition interest, which total approximately $950,000 as of the date of the filing of the Sale Motion.

44.     Lastly, FCA US has approved the Stalking Horse as its franchisor/dealer.  As set forth in ¶¶ 46-47 below, under the New York Dealer Act, FCA US would be entitled to 60 days

15

to decide whether to consent to the transfer of the Debtors' franchise rights to a successful bidder

that is not the Stalking Horse. Thus, consummating a sale with the Stalking Horse eliminates the

delay and uncertainty, and associated administrative costs and litigation risks, that would ensue

by selecting a new buyer that would be subject to FCA US's review for a two-month period if

approved and if not approved would further delay and jeopardize a Sale.

45.    The estimated, aggregate value (the "Total Stalking Horse Bid Value") that a

bidder other than the Stalking Horse must bid to qualify as a Qualified Bid (as defined in the

Bidding Procedures), is summarized as follows:

|  | Amount | Consideration/Value | Agreement |
|---|---|---|---|
| *Stalking Horse ASA* | $3,240,000 | Fixed Cash Consideration | Stalking Horse ASA |
| *Value from Stalking Horse Stipulation*<br><br>*Total:*<br>*$4,050,000* | $680,000 | Depreciation of Diverted 2017 MY and 2018 MY Vehicles | Stalking Horse ASA; Stalking Horse Stipulation |
| | $2,600,000 | Withdrawal of the FCA Realty Claims | Stalking Horse Stipulation |
| | $950,000 | Ally's waiver of post-petition attorneys' fees (approx. $200,000) certain other post-petition expenses such as for "car sitters" (approx. $212,000) and post-petition interest (approx. $538,000) | Stalking Horse Stipulation |
| *Bid Protections*<br><br>*Total: $262,000* | $65,000 | Expense Reimbursement | Stalking Horse ASA |
| | $97,200 | Break-Up Fee | Stalking Horse ASA |
| | $100,000 | Overbid Amount | Stalking Horse ASA |
| *FCA US's Approval of the Stalking Horse as a Dealer/Franchisee* | Unknown | Administrative expenses and uncertainty in subjecting alternative buyer to FCA US approval process and decision | None |
| **TOTAL** | **$7,732,200** | | |

46.    The Total Stalking Horse Bid Value is an estimate and will be used by the

Debtors as a reference point to value any competing bids.  In accordance with their business

16

judgment and role as fiduciaries of their estates, the Debtors reserve their right to modify or

supplement the Total Stalking Horse Bid Value in any manner they see appropriate and in their

sole discretion.

### c.  *The Bidding Procedures and FCA US's Review of Bids*

47.    The Bidding Procedures, which are attached to the Bidding Procedures Order as

**Exhibit 1**, are designed to maximize the value of the Assets, while effectuating an expeditious

sale of the Assets. Among other things, the Bidding Procedures set forth for interested parties to

access due diligence, the manner in which bidders and bids become "qualified," including the

disclosures that must accompany bids for the Debtors' rights under its Dealer Agreements with

FCA US, the conduct of any auction, the selection and approval of any ultimately successful

bidder(s), and the deadlines with respect to the foregoing.

48.    The Bidding Procedures provide that each bid for the Assets must be

unconditional and not contingent upon any event other than (i) approval by this Bankruptcy

Court and (ii) approval by FCA US if the bid is for the operating assets, including the Debtors'

rights under the Dealer Agreements. Under Section 463(2)(k) of the New York Franchised Motor

Vehicle Dealer Act (the "New York Dealer Act"), it is unlawful for a motor vehicle franchisor to

"unreasonably withhold consent to the sale or transfer" of a franchised dealership. If the

franchisor withholds its consent to the sale or transfer, "the franchisor shall provide specific

reasons for its withholding of consent within *sixty days* of receipt of the request for such consent

provided such request is accompanied by proper documentation as may reasonably be required

by the franchisor." *Id.* (emphasis added).

49.    The Dealer Agreements also provide that they cannot be assigned without FCA

US's consent, which shall not be unreasonably withheld.  If a franchisor withholds consent, it

01043997.3

"shall provide specific reasons for its withholding of consent within sixty days of receipt of the request." *Id.*

50.    In order to facilitate FCA US's evaluation of bids for the Purchased Assets, the Bidding Procedures require that Bids include certain financial information pertaining to the direct and indirect owner(s) of the bidder and Consumer Satisfaction Index ("CSI") Reports.  In the event FCA US does not consent to a sale to a purchaser other than the Stalking Horse, the Debtors reserve the right to seek a finding that the restrictions on assignment in the Dealer Agreements and/or the New York Dealer Act are anti-assignment clauses prohibited under § 365(f) of the Bankruptcy Code.[16]

51.    The proposed Bidding Procedures and proposed Bidding Procedures Order include the following proposed dates:

| Event | Date |
|---|---|
| Service of the Sale Notice | Within three (3) business days from entry of the Bidding Procedure Order |
| Deadline to Submit Bid | August 31, 2018 at 12:00PM |
| Date of Auction If Qualified Bid is Received (other than Stalking Horse Bid) | September 4, 2018 at 10:00AM |
| Deadline to Object to Sale of Assets to Successful Bidder and/or Backup Bidder | At Sale Hearing |
| Hearing to Authorize Sale of Assets to Successful Bidder and to Backup Bidder if Successful Bidder Fails to Close (the "Sale Hearing") | September 5, 2018 at 11:00AM |

---

[16] Several courts have held that similar state statutes circumscribing an automobile franchisor's right not to consent to the sale of franchises are valid under § 365(c)(1) of the Bankruptcy Code rather than being an invalid anti-assignment provision under § 365(f). *See, e.g.*, *In re Claremont Acquisition Corp., Inc.*, 186 B.R. 977, 980 (C.D. Cal. 1995), *aff'd*, 113 F.3d 1029 (9th Cir. 1997). However, in those decisions, the state statute *required* the manufacturer's consent whereas the New York Dealer Act simply makes it unlawful to unreasonably withhold consent. *See id.* (applying California law which states that: "There shall be no transfer or assignment of the dealer's franchise without the consent of the manufacturer or distributor, which consent shall not be unreasonably withheld."). Thus, if New York law does not require an automobile manufacturer's consent to transfer a franchise, but simply limits their right not to consent, then section then 365(c)(1) cannot  provide a basis to limit the applicability of section 365(f) and bar assignment of the franchise.

18

####    d.    *The Sale Notice*

52.     For the reasons set forth in this Sale Motion, the Debtors wish to proceed to the

Sale and Sale Hearing as expeditiously as the Court's calendar will allow, while providing the

requisite notice of the proposed Sale as required under Bankruptcy Rule 2002.

53.     In accordance with Bankruptcy Rule 2002, the Debtors propose to give notice of

the Bidding Procedures, and the proposed Sale by serving a Notice, substantially in the form

annexed to the Proposed Order as <u>Exhibit 2</u>.  The Debtors propose to serve the Sale Notice

within three (3) business days after the entry of the Bidding Procedures Order upon: (i) all

potential purchasers reasonably known to the Debtors, (ii) all parties who have requested notice

pursuant to Bankruptcy Rule 2002, (iii) the Internal Revenue Service, (iv) the Stalking Horse, (v)

Ally, (vi) the New York City Department of Finance, (vii) the New York State Department of

Taxation, (viii) the Office of the United States Trustee for the Southern District of New York;

(ix) the FCA Entities; (x) all creditors and Counterparties (as defined below) appearing on the

Debtors' schedules; and (xi) all creditors that have filed proofs of claim against the Debtors.

54.     The Debtors submit that the foregoing notice is reasonably calculated to provide

timely and adequate notice of the Bidding Procedures, the Sale and all proceedings to be held

thereon to the Debtors' creditors and other parties in interest, and also to those who have

expressed interest, or may express interest, in bidding on the Assets.

####    e.    *The Assumption and Assignment Procedures*

55.     The Assumption and Assignment Procedures are designed to complement and be

compatible with the Bidding Procedures and to help effectuate the Sale process. The Assumption

and Assignment Procedures will provide a procedure for the Debtors to communicate to each

counterparty (each, a "<u>Counterparty</u>," and collectively, the "<u>Counterparties</u>") to an executory

contract or unexpired lease that the Debtors may seek to assume or assume and assign,[17] the

cure amount (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to

the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code and

Adequate Assurance Information (defined below) and to resolve any dispute regarding each

Debtor's assumption or assumption and assignment of an Executory Contract.

56.    Below are the key features and dates in the Assumption and Assignment

Procedures:

| Event | Date |
|---|---|
| File and serve notice identifying which executory contracts and unexpired leases the Debtors anticipate assuming and assigning as part of the Sale and their corresponding Cure Amounts | August 21, 2018 at 5:00PM |
| Objections to the Debtors' proposed and assumption and assignment of executory contracts and unexpired leases other than objections concerning adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (a "Contract Objection") | August 30, 2018 at 5:00PM<br><br>(the "Contract Objection Deadline") |
| Request (an "Adequate Assurance Request") by Counterparty for relevant materials and information collected from the Stalking Horse and each Qualified Bidder pursuant to the Bidding Procedures that expressed an interest in the Counterparties' executory contract or unexpired lease supporting such Qualified Bidder's ability to provide adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code ("Adequate Assurance Information") | August 31, 2018 at 5:00PM |
| Provide applicable Counterparty  Adequate Assurance Information in response to an Adequate Assurance Request | September 4, 2018 at 10:00AM |
| Lodge Adequate Assurance Objection | At Sale Hearing |

---

[17] As the Dealership Leases have expired, the Debtors will not be assuming and assigning any real property leases to the Stalking Horse or any other bidder.

01043997.3

57.     Under the proposed Assumption and Assignment Procedures, any objection to (i) the Debtors' ability to assume and/or assign an executory contract or unexpired lease; or (ii) to a Cure Amount, must be filed by the Contract Objection Deadline. If no Contract Objection (which does not include an Adequate Assurance Objection) is timely filed by the Contract Objection Deadline: (i) the Counterparty to such executory contract or unexpired lease shall be forever barred from asserting any objection with regard to such assumption and assignment, other than an Adequate Assurance Objection; (ii) any and all defaults under such executory contract or unexpired lease and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Amount; and (iii) the Cure Amount proposed by the Debtors shall be controlling, notwithstanding anything to the contrary and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such executory contract or unexpired lease against the Debtors and (if applicable) the Debtors' assignee(s).

### f.    The Rejection Procedures

58.     As the Debtors will cease operating as going concerns due to the Sale, many if not all of the contracts and leases that will not be assumed by the Stalking Horse or other purchaser of the Assets and will provide no value to the Debtors. Many of the Debtors' executory contracts and unexpired leases, other than the Dealer Agreements, are routinely offered to the public on standard terms. Therefore, no economic value will be obtained in assuming and assigning these executory contracts and unexpired leases, particularly those that would require the payment of Cure Amounts.  However, unless rejected these executory contracts and unexpired leases may pose a continuing administrative expense burden while providing no corresponding benefit.

01043997.3

59.     In order to expeditiously and efficiently provide for the prompt rejection of

burdensome unexpired leases and executory contracts, the Debtors propose the following

Rejections Procedures:

- Rejection Notice. The Debtors will file a notice (the "Rejection Notice"), a copy
  which is annexed to the proposed Bidding Procedures Order as **Exhibit 4**, to
  reject the identified unexpired lease(s) and/or executory contract(s) pursuant to
  section 365 of the Bankruptcy Code, which Rejection Notice shall set forth,
  among other things: (i) the unexpired lease(s) and/or executory contracts(s) to be
  rejected; (ii) the names and addresses of the relevant Counterparties; (iii) the
  proposed effective date of the rejection for each such  unexpired lease(s) and/or
  executory contract(s) ("Rejection Date"); and (iv) the deadlines and procedures
  for filing objections to the Rejection Notice (as set forth below). The Rejection
  Notice shall include the proposed order approving rejection of the unexpired
  lease(s) and/or executory contract(s) (the "Rejection Order").

- Service of the Rejection Notice. The Debtors will cause the Rejection Notice to be
  served by regular mail upon the Counterparties, and their counsel, if known,
  affected by the Rejection Notice.

- Objection Procedures. Parties objecting to a proposed rejection must file and
  serve a written objection so that such objection is filed with the Court and is
  actually received by the Debtors no later than fourteen (14) calendar days after the
  date the Debtors serve the relevant Rejection Notice (the "Rejection Objection
  Deadline").

- Event of No Objection. Absent an objection being filed by the Rejection
  Objection Deadline, the Debtors shall submit the proposed Rejection Order within
  five (5) days of the Rejection Objection Deadline, together with a statement
  confirming the absence of any timely objections to the relief granted by the
  Rejection Order. The Rejection Order shall set forth the applicable bar date for
  filing claims arising from the rejection of such unexpired lease(s) and/or
  sublease(s) and the Rejection Date.

- Unresolved Objections. If an objection to the rejection of any unexpired lease(s)
  and/or executory contracts(s) is timely filed and not withdrawn or resolved, the
  Debtors shall obtain from the Court a date for a hearing to consider the objection
  and file a notice for a hearing for the Court to consider the objection for the
  unexpired lease(s) and/or executory contract(s) to which such objection(s) relates.
  If such objection is overruled or withdrawn, such unexpired lease(s) and/or
  executory contracts(s) shall be deemed rejected as of the Rejection Date or such
  other date to which the Debtors and the counterparty to such unexpired lease(s)
  and/or executory contract(s) have agreed or such other date as determined by the
  Court.

22

01043997.3

### g. *Extraordinary Provisions Under Local Guidelines*

60.     The Stalking Horse ASA and the relief requested in this Sale Motion contain the

following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by General

Order M-331, require to be separately disclosed:

- Use of Proceeds. The Stalking Horse ASA allocates 80 percent of the Fixed Cash

  Consideration ($2,592,000) to the Purchased Assets owned by Manhattan JCDR,

  which amount shall be payable to Manhattan JCDR and allocates the remaining 20

  percent ($648,000) to the Purchased Assets of Manhattan ARF. The allocation of the

  Fixed Cash Consideration among the Debtors is based on each Debtor's average

  yearly vehicle sales as a percentage of the Debtors' total combined sales, *i.e.*,

  Manhattan JCDR provides approximately 80 percent of the Debtors' total sale and

  Manhattan ARF provides the remaining 20 percent.

- Relief from Bankruptcy Rules 6004(h) and 6006(d): The Debtors seek relief from the

  14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## III. RELIEF REQUESTED

61.     The Debtors seek entry of the Bidding Procedures Order, substantially in the form

attached hereto as **Exhibit A** approving:

- The Stalking Horse ASA, a copy of which is attached hereto as **Exhibit B**;

- The Bid Protections set forth above and in Section 26 of the Stalking Horse ASA;

- The Bidding Procedures, a copy of which is attached to the Bidding Procedures Order
  as **Exhibit 1**;

- The Sale Notice, a copy of which is attached to the Bidding Procedures Order as
  **Exhibit 2**;

01043997.3

- The Assumption and Assignment Procedures and the corresponding Assumption Notice, a copy of attached to the Bidding Procedure Order as **Exhibit 3**; and

- The Rejection Procedures and the corresponding Rejection Notice, a copy of attached to the Bidding Procedure Order as **Exhibit 4**.

62.     Further, the Debtors also hereby move for entry of the Sale Order (a) approving the sale of the Assets free and clear of all Interests to the Stalking Horse or other Successful Bidder, (b) authorizing the assumption and assignment or rejection of certain executory contracts and unexpired leases (c) approving the Stalking Horse Stipulation attached hereto as **Exhibit C**; and (d) granting related relief.

### IV. <u>BASIS FOR RELIEF REQUESTED</u>

### a. *The Proposed Bidding Procedures are Reasonable and Will Maximize the Value of the Debtors' Estates.*

63.     Courts have made clear that a trustee or debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R, 650, 656-57 (S.D.N.Y. 1992) (Mukasey, J); *In re Global Crossing Ltd.*, 295 B.R. 726,742-44 (Bankr. S.D.N.Y 2003). The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the Code [is] to enhance the value of the estate at hand."); *Integrated Resources*, 147 B.R. at 659 (same); *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) (same). Accordingly, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *Integrated Resources*, 147 B.R. at 659.

01043997.3

64.     The Debtors submit that the Bidding Procedures are fair and reasonable and will ensure that the bidding process and the Auction (to the extent necessary) will yield the maximum value for the Debtors' estates and creditors. The Bidding Procedures allow all parties in interest an opportunity to conduct in-depth diligence. The Bidding Procedures also provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtors and their economic stakeholders. The Bidding Procedures clearly set forth the participation requirements for Qualified Bidders and bids. In addition, the Bidding Procedures disclose the Stalking Horse ASA and provide that to be a Qualified Bid any competing bid must provide value to the Debtors' estate in an amount that is higher or better than the Total Stalking Horse Bid Value.[18]

65.     Most importantly, the Sales process envisioned by the Sale Motion provides possibly the only way for the Debtors, consistent with their fiduciary duties, to monetize the value of the Assets for the benefit of not only all of the creditors, but the Debtors' employees, who may be terminated if the Debtors are not able to sell their Assets as a going concern. Therefore, the granting of the Sale Motion not only provides the best method of maximizing the estates' assets, but it will provide the Debtors' employees with an opportunity to maintain their jobs.

**b.   *The Sale of Substantially All of the Debtors' Assets Is Authorized by Section 363(b) of the Bankruptcy Code*.**

66.     Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use,

---

[18] The Bidding Procedures refers the reader to the Sale Motion for background and explanation of the Stalking Horse Total Bid Value.

01043997.3

sale or lease of property of the estate, courts require that such use, sale or lease be based upon a debtor's sound business judgment of the debtor. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

67.     The business judgment rule shields a trustee or debtor's management from judicial second-guessing. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *Integrated Resources*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). *See also In re Global Crossing Ltd.*, 295 B.R. 726,742-44 (Bankr. S.D.N.Y 2003). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

68.     In addition, it is well-established that a section 363 sale is an appropriate means to effectuate a liquidation in a Chapter 11 case. *See In re Chrysler LLC*, 405 B.R. 84, 96 (Bankr. S.D.N.Y.), *aff'd,* 576 F.3d 108 (2d Cir. 2009), *cert. granted, judgment vacated sub nom. Indiana State Police Pension Trust v. Chrysler LLC*, 558 U.S. 1087, 130 S. Ct. 1015, 175 L. Ed. 2d 614 (2009), and *vacated sub nom. In re Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010) (citing *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37, note 2 (2008)); *In re GSC, Inc.*, 453 B.R. 132, 155–56 (Bankr. S.D.N.Y. 2011) (citing *In re Gen. Motors Corp.,* 407 B.R. 463, 488 (Bankr.S.D.N.Y.2009)).

69.     Lastly, a debtor's decision to forgo additional marketing efforts and pursue an expeditious sale is an exercise of its sound business judgment particularly when the value of its

assets is diminishing with time and its enterprise value may evaporate absent a quick sale. *See In re Chateaugay Corp.* 973 F.2d 141, 144 (2d Cir. 1992) (affirming section 363 sale in case where the "courts below found that further delay [of the sale of substantially all of the debtor's assets] risks that assets will be sold for later and for less"); *Stephens Indus. Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (affirming sale to prevent loss of FCC licenses)*; In re Equity Mgmt. Sys*, 149 B.R. 120, 124 (Bankr. S.D. Iowa 1993) (allowing a prompt sale of assets to avoid loss of business opportunity).

70.     The prompt sale of the Assets to the Stalking Horse or any higher or better Qualified Bid is the best, and perhaps the only, opportunity to maximize the value of the Debtors' estates. Based on the Debtors' marketing efforts prior to and after the Petition Date, the Debtors submit that the Purchase Price under the Stalking Horse ASA, as enhanced by other value contributed to the Debtors by the FCA Entities and Ally under the Stalking Horse Stipulation, constitutes a fair market value for the Assets that will be tested by the bidding process.

71.     Moreover, it is imperative that the Debtors implement the expeditious Sales process contemplated by this Motion. As explained above, the previous MY vehicles in the Debtors' inventory will depreciate with time; which depreciation will accelerate once 2019 MY vehicles begin to populate a greater proportion of the market this Summer and Fall. In addition, as also explained above, in the event that a purchaser other than the Stalking Horse Bidder is selected as the successful bidder, under the New York Dealer Act, FCA US is entitled to 60 days to decide whether to approve the transfer of the Purchased Assets to the successful bidder, which will itself add to the estates' administrative expenses and cause additional depreciation to the Assets.

72.     As set forth above, the Bidding Procedures are designed to facilitate competitive bidding and identify Qualified Bids that can compete with the Stalking Horse Bid. Thus, the Debtors are confident that the value to be obtained for the Assets will represent an optimal value for the Assets under the circumstances.

73.     For all of these reasons, the Debtors have determined that the best if not the only viable opportunity to maximize value for the Debtors' estates is to sell the Assets as set forth in this Sale Motion. Accordingly, it is a valid exercise of the Debtors' business judgment to seek approval of the Bidding Procedures and the Sale.

> ### c.     *Section 363(f) Authorizes the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances.*

74.     The Debtors seek to sell, under Section 363(f) of the Bankruptcy Code, the Assets free and clear of liens, claims, and encumbrances, with such liens, claims and encumbrances attaching to the proceeds of sale of the Assets to the same extent, validity and priority that existed as of the Petition Date.

75.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property, under section 363(b) or (c), free and clear of any interest in such property of an entity other than the estate. 11 U.S.C. § 363(f). A sale free and clear of liens may be approved only if at least one of the following five conditions are met: "(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction of such interest." *Id.*

76.     Section 363(f)(2), (3) provide grounds to authorize the Sale to the Stalking Horse, because, as indicated by the Stalking Horse ASA, (i) Ally consents to the Sale of the Assets to

the Stalking Horse and the (ii) Sale will generate sufficient proceeds to fully satisfy Ally's

secured claim. To the extent Ally does not consent to the Sale to a bidder other than the Stalking

Horse, and such Sale would not yield enough proceeds to satisfy its claim, section 363(f)(3)

would nevertheless authorize the Sale of the Assets fee and clear of Ally's liens.[19] This Court has

interpreted the term value in "aggregate *value* of liens" to "to be determined by reference to

section 506(a) – that is, it is the amount by which the lienholder's claim is actually secured." *In

re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010) (citing *In re Beker

Industries Corp.,* 63 B.R. 474 (Bankr.S.D.N.Y.1986)).  Because the "market place is the best

indicator of value," where a sale is a product of an arm's length transaction and a robust sale

process, the "value" of the liens referenced in section 363(f)(3) equals the "value" of the offer for

the property. *Id.* at 326, 332, and note 27. As explained above, the Stalking Horse Bid, or a

higher or better bid that results from an auction, will represent the best possible price for the

Assets available in the marketplace. Nonetheless, even under the narrower interpretation of §

363(f) that reads "value" to refer to the face amount of the lien,[20] section 363(f)(3) will likely be

---

[19] The Debtors reserve the right, prior to or at the Sale Hearing, if needed, to assert that other subsections of § 363(f) apply. For example, the New York Dealer Act may provide a basis under § 363(f)(5) to compel[] [Ally], in a legal or equitable proceeding, to accept a monetary satisfaction of such interest." Specifically, section 463(o) of New York Dealer Act requires franchisors to repurchase certain of a franchisee's property (e.g., certain vehicles and parts) upon termination of a franchise. In addition, some or all of the Dealer Agreements required FCA US to repurchase certain FCA Products from the Debtors upon termination of the franchises "free and clear of any liens and encumbrances." *See Motion FCA US LLC For Relief From the Automatic Stay To Terminate Executory Contracts Under 11 U.S.C. § 362(d)* [ECF No. 32-2 (Ex. B) page 22].

Thus, the Debtors' commencement of proceedings to enforce the repurchase obligation under the New York Dealer Act and the Dealer Agreements may constitute a "legal proceeding" through which the Debtors could compel Ally to accept less than full payment for its secured claim. *See Clear Channel Outdoor, Inc., v. Knupfer (In re PW, LLC),* 391 B.R. 25 (9th Cir. BAP 2008) (citing as an example of an arrangement that would qualify under § 363(f)(5) as a "buy-out arrangement among partners, in which the controlling partnership agreement provides for a valuation procedure that yields something less than market value of the interest being bought out.").

[20] *See Clear Channel Outdoor, Inc., v. Knupfer (In re PW, LLC),* 391 B.R. 25 (9th Cir. BAP 2008). The Court in *Boston Generating* declined to follow *Clear Channel.*

satisfied, because it is anticipated that the proceeds of the Sale to any Bidder will be sufficient to

satisfy Ally's claim in full.

77.    For the foregoing reasons, there are more than ample bases to approve the Sale of

the Assets pursuant to § 363(f) free and clear of all claims, liens, encumbrances, and interests.

> ### d.    The Stalking Horse Bidder and Any Other Successful Bidder and Backup Bidder Will be a Good Faith Purchaser and Will be Entitled to the Full Protections of Section 363(m) of the Bankruptcy Code.

78.    The Debtors request that the Court find that the Stalking Horse Bidder, or any

other Successful Bidder and the Backup Bidder, are entitled to the full protections of section

363(m) of the Bankruptcy Code. Courts have indicated that a party would have to show fraud or

collusion between the buyer and the debtor in possession or trustee or other bidders in order to

demonstrate a lack of good faith. *See In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997)

("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale

involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to

take grossly unfair advantage of other bidders."); *See also In re Angelika Films 57th, Inc.*, 1997

U.S. Dist. LEXIS 7463 at *19-*28 (S.D.N.Y. May 29, 1997).

79.    As discussed, there is ample business justification for the proposed Sale of the

Assets, the Sale will have been pursued in good faith, and there will have been no fraud or

collusion between the Debtors, the Stalking Horse, any other Qualified Bidder, the FCA Entities,

or any other interest party. The Stalking Horse ASA, as enhanced by the Stalking Horse

Stipulation, is the product of extensive, months' long, and arm's length negotiations between the

Debtors, Ally, the FCA Entities, and the Stalking Horse.  In addition, the Bidding Procedures

will require that, at the commencement of any Auction all Qualified Bidders confirm that they

have not engaged in any collusion with respect to the bidding or the sale of Assets with any other

Qualified Bidder or any other interested party. (Bidding Pro. ¶ 4(C)(iii).)

80.    Further, the Successful Bidder (including the Stalking Horse if there is no

Auction) and the Backup Bidders (collectively, as the "Prevailing Bidders") will have recognized

that the Debtors are free to deal with any other party interested in acquiring the Assets. At the

Sale Hearing, the Debtors will be able to demonstrate that the Prevailing Bidders have also

complied with the Bidding Procedures Order and agreed to subject their bids to the competitive

Bidding Procedures. Additionally, all payments to be made to the Prevailing Bidders and other

agreements or arrangements entered into by the Prevailing Bidders in connection with the Sale

will have been disclosed. In this regard, the Debtor intends to offer evidence at the Sale Hearing

to show that such Prevailing Bidders are entitled to the protection of section 363(m) of the

Bankruptcy Code.

### e. The Bid Protections Have Sound Business Purpose and Should be Approved

81.    The Bid Protections were negotiated in good faith and are necessary to secure the

Stalking Horse's commitment to purchase the Assets.  The Debtors believe that the Bid

Protections are tailored to advance the Debtors' goal to obtain the commitment of the Stalking

Horse, whose presence will encourage bidding, while not unnecessarily increasing the

consideration that the Debtors' estate will realize under any alternative transaction.

82.    Courts have recognized that bid protections may be used to protect bidders in

connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and that such

fees can be "important tools to encourage bidding and to maximize the value of the debtor's

assets." *In re Integrated Res., Inc.,* 147 B.R. at 659. Such stalking horse bid protections facilitate

a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable,

01043997.3

while providing the debtor with the opportunity to obtain even greater benefits for the estate

through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight'

to enter the bidding by providing some form of compensation for the risks it is undertaking")

(citation omitted).

83.     The Bid Protections are reasonable and appropriate in light of the size and nature

of the transaction and the efforts that have been and will be expended by the Stalking Horse. The

Breakup Fee ($97,500) equals 3 percent of the Fixed Cash Consideration, which is one

component of the Purchase Price. The Expense Reimbursement is an amount equal to the

reasonable out-of-pocket documented fees and expenses that will be incurred by the Stalking

Horse in connection with the Stalking Horse ASA, and is capped at $64,800.

84.     Courts in this District have approved breakup fees and expense reimbursements

so long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does

not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the

transaction. *Integrated Res., Inc.*, 147 B.R. at 657. The Debtors submit that the Breakup Fee and

the Expense Reimbursement will not chill bidding, are reasonable, and ultimately will promote

the Debtors' ability to maximize the value of their estates.

85.     This Court has approved protections similar to the proposed Bid Protections as

reasonable and consistent with the type and range of bidding protections typically approved. *See,*

*e.g.*, *In re D.A.B. Grp., LLC*, No. 14-12057 (SCC) (Bankr. S.D.N.Y. Dec. 18, 2014) (approving

bidder protections of approximately 3% of the purchase price); *In re Choice Building Supplies of*

*Westchester Co. Inc.*, No. 13-23859 (RDD) (Bankr. S.D.N.Y. May 5, 2014) (approving bidder

protections of approximately 3.64% of the purchase price); *In re Hostess Brands, Inc.*, No. 12-

22052 (RDD) (Bankr. S.D.N.Y. Jan. 28, 2013) (approving a breakup fee of approximately 3% of

the purchase price); *In re HMX Acquisition Corp.*, No. 12-14300 (ALG) (Bankr. S.D.N.Y. Nov.

29, 2012) (approving bidder protections of approximately 3.46% of the purchase price); *In re*

*Bos. Generating, LLC*, No. 10-14419 (SCC) (Bankr. S.D.N.Y. Oct. 12, 2010) (approving bidder

protections totaling approximately 3.18% of the purchase price); *In re Cabrini Med. Ctr.*, No.

09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a breakup fee of approximately

3.75% of the purchase price); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 23,

2009) (approving a breakup fee and expense reimbursement totaling approximately 3.72% of the

total purchase price); *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7,

2009) (approving a breakup fee and expense reimbursement totaling approximately 3.43% of the

purchase price); *In re SiliconGraphics, Inc.*, No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009)

(approving a breakup fee and expense reimbursement totaling approximately 6% of the total

purchase price).

86.    In addition, the Stalking Horse ASA requires that, in the event the Sale is

consummated with another bidder, the Break-Up Fee and the Expense Reimbursement be paid to

the Stalking Horse from the proceeds of the Sale. In order to effectuate the forgoing requirement,

the Court must grant the Break-Up Fee and Expense Reimbursement superpriority administrative

expense status. This Court has granted superpriority administrative expense status to breakup

fees and the reimbursement of expenses that become due under the terms of a stalking horse

purchase agreement. *See, e.g., In re Cabrini Med. Ctr.*, No. 09-14398 (AJG), 2009 WL 7193577,

at *5 (Bankr. S.D.N.Y. Dec. 30, 2009) (granting stalking horse purchaser an allowed

superpriority administrative expense claim with respect to the debtor's obligation to pay a

breakup fee where, among other things, purchaser required such superpriority as a prerequisite to

01043997.3

entering into the sale); *see also In re Worldspace, Inc.*, No. 08-12412 (PJW), 2010 WL 4739929, at *6 (Bankr. D. Del. Jun. 2, 2010) (granting breakup fee superpriority administrative status where such breakup fee was an essential element of the purchase agreement); *In re Taylor-Wharton Int'l LLC*, No. 09-14089 (BLS), 2010 WL 5093120, at *5 (Bankr. D. Del. May 12, 2010) (granting stalking horse bidder an allowed superpriority administrative expense claim in each of the debtors' chapter 11 cases with respect to the debtors' obligation to pay a breakup fee and expense reimbursement, subject only to certain expenses arising in connection with the debtors' postpetition financing arrangement).

87.    The Stalking Horse requires the Bid Protections as a precondition to entering into the Stalking Horse ASA, and the Debtors have determined the inclusion of it into the Stalking Horse ASA is absolutely necessary to successfully pursue the Sale and maximize recoveries for the Debtors' estates. The Bid Protections are necessary to successfully pursue the Sale, will not chill bidding, and will maximize recoveries for the Debtors' estates. Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose and is fair and appropriate under the circumstances, and should be approved.

### f.    Assumption and Assignment or Rejection of Contracts

88.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume or reject an executory contract or unexpired lease, courts will approve the assumption or rejection under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods., Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).

89.     If an executory contract or unexpired lease is in "default", the debtor or trustee

"may not assume such contract or lease unless, at the time of the assumption of such contract of

lease, the debtor

> (A) cures, or provides adequate assurance that the trustee will promptly cure,
> such default other than a default that is a breach of a provision relating to the
> satisfaction of any provision (other than a penalty rate or penalty provision)
> relating to a default arising from any failure to perform nonmonetary
> obligations under an unexpired lease of real property, if it is impossible for the
> trustee to cure such default by performing nonmonetary acts at and after the
> time of assumption, except that if such default arises from a failure to operate
> in accordance with a nonresidential real property lease, then such default shall
> be cured by performance at and after the time of assumption in accordance
> with such lease, and pecuniary losses resulting from such default shall be
> compensated in accordance with the provisions of this paragraph;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly
> compensate, a party other than the debtor to such contract or lease, for any
> actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or
> lease.

11 U.S.C. § 365(b)(1).

90.     The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." *See*

*Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J.

1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean absolute assurance that debtor

will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D.

Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance."). Among other things, adequate

assurance may be given by demonstrating the assignee's financial health and experience in

managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-

06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when

prospective assignee of lease has financial resources and expressed willingness to devote

sufficient funding to business to give it strong likelihood of succeeding; in the leasing context,

chief determinant of adequate assurance is whether rent will be paid).

91.    The Debtors submit that the proposed Assumption and Assignment Procedures

and the proposed Rejection Procedures are in conformity with section 365 of the Bankruptcy

Code and Bankruptcy Rule 6006 and are in the best interests of the Debtors' estates by

facilitating the Sales process outlined in the Sale Motion.  The Assumption and Assignment

Procedures and the Rejection Procedures will provide procedures to expeditiously resolve any

disputes concerning the assumption and assignment or rejection of any executory contracts and

unexpired leases in a manner that provides adequate notice and protections to each Counterparty

and that is consistent with the deadlines and process set forth in the Sale Motion.

### g.    The Stalking Horse Stipulation is Fair, Equitable, and in the Best Interests of the Debtors' Estates.

92.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when

the compromise is fair and equitable and is in the best interests of a debtor's estate. *See, e.g.,*

*TMT Trailer Ferry*, 390 U.S. at 424; *Adelphia Commc'ns*, 327 B.R. at 159 ("The settlement need

not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the

reasonable range of litigation possibilities.'") (citations omitted) (quoting *In re Penn Cent.

Transp. Co*., 596 F.2d 1102, 1114 (3d Cir. 1979)); *Nellis v. Shugrue*, 165 B.R. 115, 121

(S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is

in the best interest of an estate before approving it."). In general, compromises in the bankruptcy

context should be approved unless they "'fall below the lowest point in the range of

reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)

(quoting *Newman v. Stein*, 464 F. 2d 689, 693 (2d Cir. 1972)).

93.    Courts in this District have considered the following factors when determining

whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the

balance between the likelihood of plaintiff's or defendants' success should the case go to trial

vis-à-vis the concrete present and future benefits held forth by the settlement without the expense

and delay of a trial and subsequent appellate procedures; (b) the prospect of complex and

protracted litigation if the settlement is not approved; (c) the proportion of the class members

who do not object or who affirmatively support the proposed settlement; (d) the competency and

experience of counsel who support the settlement; (e) the relative benefits to be received by

individuals or groups within the class; and (f) the extent to which the settlement is truly the

product of arm's-length bargaining, and not of fraud or collusion. *See In re Iridium Operating

LLC*, 478 F.3d 452, 462 (2d Cir. 2007) (citing *TMT Trailer Ferry*, 390 U.S. at 424 25)

("*Iridium*"); *Adelphia Commc'ns*, 327 B.R. at 159-60.

94.    A Bankruptcy Court need not determine that all of the foregoing criteria favor

approval of a compromise, and the proposed compromise need not be the best agreement that the

debtor could have achieved under the circumstances. *See Adelphia Commc'ns*, 327 B.R. at 159

60; *Penn Cent.,* 596 F.2d at 1114. Instead, the bankruptcy court's "role is to determine whether

the settlement as a whole is fair and equitable," *In re Lee Way Holding Co.*, 120 B.R. 881, 890

(Bankr. S.D. Ohio 1990), and to ascertain whether the settlement falls "'within the reasonable

range of litigation possibilities.'" *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 553 (Bankr.

N.D. Ill. 1994). To that end, bankruptcy courts should not substitute their own judgment for that

of the debtor, but rather should "canvass the issues" to affirm that the proposed settlement falls

above "the lowest point in the range of reasonableness.'" *Adelphia Commc'ns*, 327 B.R. at 159

(quoting *W.T. Grant Co.*, 699 F.2d at 608 (2d Cir. 1983)); *accord Air Line Pilots Ass'n, Int'l v.*

*Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993),

*aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co.*, 17 F.3d 600 (2d Cir. 1994).

95.    At discussed in length above, the Stalking Horse Stipulation is indisputably in the

best interests of the Debtors' estates and represents an overarching (and nearly comprehensive)

resolution of claims and issues between and among the Debtors and Ally and the FCA Entities.

More important, the Stalking Horse Stipulation is a central component of the Sale to the Stalking

Horse.  The key terms of the Stalking Horse Stipulation and, to the extent applicable each

corresponding benefit (among others not detailed here) to the Debtors' estates, are as follows:

- **FCA Realty Claims**. Withdrawal of the FCA Realty Claims which will total no less than $2,600,000 by August 31, about half of which is an administrative expense for unpaid rent. (Stip. ¶ 2.)

- **Diversion**. FCA US will undergo the Diversion (as that term is defined in the stipulation) at its sole expense (*Id*. ¶ 1.) Upon the Diversion, FCA US will remit to Ally the Net Amount (as the term is defined in the Stalking Horse Stipulation) for each Diversion Vehicle. (*Id*. ¶ 4.) The Diversion relieves the Debtors' estates and the Stalking Horse of depreciating assets that are estimated to lose $680,000 in value over the next few months. In addition, FCA US's payments to Ally will ensure that no deficiency claim of Ally will arise from the disposition of the depreciating Diversion Vehicles.

- **Payment of the Holdback Amount**. The Debtors will remit to Ally the Holdback Amount (as defined in the Stalking Horse Stipulation) for all vehicles (i.e., those diverted and those purchased by the Stalking Horse). (*Id*. ¶ 3.)

- **Ally's Postpetition Claims**. Ally will waive its post-petition claims, including for attorneys' fees, the Car Sitter Fees, and interest (which total approximately $950,000 as of the filing of the Sale Motion), which will likely be recoverable under section 506(b) of the Bankruptcy Code, subject to the potential that Ally may recover up to $250,000, which may be applied to such post-petition claim.

- **Damage to Diversion Vehicles**. Establishes a mechanism and procedure for identifying and communicating to the relevant parties any damage to the Diversion Vehicles and for compensating FCA and/or Ally for such damage. An

$83,588.59 reserve (the "Diversion Damages Cap") is established to compensate FCA US for any damages to the Diversion Vehicles. To the extent the damages are less than the Diversion Damages Cap then such amount is transferred to Ally and then to the Debtors when the Diversion is completed. (*Id*. ¶ 5(b).)

- Lost Vehicles. Establishes parameters for the Debtors' compensation to Ally for "lost" vehicles that were purchased with an Advance from Ally but do not appear in the Inventory (and thus cannot be diverted). (*Id*. ¶¶9, 10.)

- Releases. The parties will receive mutual releases for claims arising through the closing of the Stalking Horse ASA (including those already described above).

96.    As described above, the Stalking Horse Stipulation should be approved as it is immensely beneficial to the estate and critical to the Debtors' Sales process.

## V.  RELIEF UNDER BANKRUPTCY
## RULES 6004(h) AND 6006(d) IS APPROPRIATE

97.    Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). Also, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d). The Debtors requests that any order approving the Bidding Procedures, the Staking Horse ASA, or any other transaction in connection with the Sale be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

98.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to FED. R. BANKR. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that the 14-

day stay period should be eliminated to allow a sale or other transaction to close immediately

"where there has been no objection to the procedure." 10 Lawrence P. King, Collier on

Bankruptcy, 6004.10 (16th Ed. 2011). Collier further provides that if an objection is filed and

overruled, and the objecting party informs the court of its intent to appeal, the stay may be

reduced to the amount of time actually necessary to seek a stay, unless the court determines that

the need to proceed sooner outweighs the interests of the objecting party. *Id.*

99.     To preserve and maximize the value of the Assets, the Debtors seek to implement

the Bidding Procedures as quickly as possible, as well as close the Sale as soon as possible after

the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day

stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to

the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting

party to seek a stay pending appeal.

## VI. CAUSE EXISTS TO SHORTEN NOTICE

100.    Bankruptcy Rule 2002(a)(2) provides that notice of a "proposed use, sale, or lease

of property of the estate other than in the ordinary course of business" shall be given no less than

21 days prior to the hearing date, "unless the court for cause shown directs that notice not be

sent." In addition, Bankruptcy Rule 9006(c) provides that "when an act is required or allowed to

be done at or within a specified time by these rules or by a notice given thereunder or by order of

court, the court for cause shown may in its discretion with or without motion or order the notice

period reduced." FED. R. BANKR. P. 9006(c).

101.    For the reasons discussed above, granting the relief requested by the Debtors on

an expedited basis is absolutely critical to preserving and maximizing the Debtors' values as

going concerns. It is vital that the Debtors implement an expeditious sales process for the

01043997.3

additional reason that the Debtors' Inventory is depreciating due to the mere passage of time and Ally's secured claim continues to accrue interest. Accordingly, the Debtors submit that there is more than adequate cause to consider the Sale Motion at a hearing on or before August 16, 2018. *See In re The Alphas Co. of N.Y. Inc.*, No. 15 CIV. 1106 (LGS), 2016 WL 347341, at *5 (S.D.N.Y. Jan. 27, 2016) (affirming the bankruptcy court's decision to shorten the 21-day notice period for a hearing on a Bankruptcy Rule 9019 motion to thirteen days).

## NOTICE

102.    Notice of this Sale Motion has been served by overnight mail upon: (i) all parties who have requested notice pursuant to Bankruptcy Rule 2002, (ii) counsel for Ally; (iii) counsel for the Stalking Horse; (iv) the holders of the 20 largest unsecured claims against the Debtors; (v) counsel for the FCA Entities; and (vi) the Office of the United States Trustee.

**WHEREFORE** the Debtors respectfully request that the Court enter the Bidding Procedures Order in substantially the same form as the proposed order attached hereto as Exhibit A, together with such other and further relief as the Court deems appropriate.

Dated:  New York, New York
       August 10, 2018

**WILK AUSLANDER LLP**

By: /s/ Eric J. Snyder
     Eric J. Snyder, Esq.
     Eloy A. Peral, Esq.
1515 Broadway, 43rd Floor
New York, New York 10036
(212) 981-2300

*Counsel for the Debtors and
Debtors in Possession*