UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:                                                          :      Chapter 11
                                                                :
**MANHATTAN JEEP CHRYSLER DODGE,**      :      Case No. 18-10657 (MEW)
**INC., et al.,**[1]                                      :
                                                                :      Jointly Administered
          Debtors.                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**BENCH DECISION REGARDING MOTION BY LOCAL 868
INTERNATIONAL BROTHERHOOD OF TEAMSTERS
PENSION <u>FUND FOR PERMISSION TO FILE LATE CLAIM</u>**

A P P E A R A N C E S:

WILK AUSLANDER LLP
  Attorneys for Debtors
  1515 Broadway
  New York, NY 10036

  BY: ERIC SNYDER, ESQ.
       ELOY A. PERAL, ESQ.

ARCHER, BYINGTON, GLENNON & LEVINE LLP
  Attorneys for Local 868 International
  Brotherhood of Teamsters Pension Fund
  One Huntington Quadrangle
  Suite 4C10
  Melville, NY 11747

  BY: MATTHEW HROMADKA, ESQ.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

      Before the Court is a motion by the trustees of Local 868 Pension Fund (the "Fund") for

permission to file a late proof of claim in the Chapter 11 cases of Manhattan Jeep Chrysler

---

[1]   The last four digits of each Debtor's taxpayer identification number are as follows: Manhattan Jeep Chrysler Dodge, Inc. (2520); Manhattan Automotive, L.L.C. (3993). The Debtors' addresses are 678 Eleventh Avenue, New York, NY 10019 and 629 West 54th Street, New York, NY 10019, respectively.

1

18-10657-mew    Doc 187    Filed 04/03/19    Entered 04/03/19 15:38:30    Main Document
Pg 2 of 15


Dodge, Inc. and Manhattan Automotive, LLC. The claim is based on the participation by Manhattan Jeep in a multi-employer pension plan. The governing federal statute provides that a permanent cessation of Manhattan Jeep's operations, or any other termination of Manhattan Jeep's obligations to contribute to the Fund, triggered a withdrawal liability to the Fund. *See* 29 U.S.C. §§ 1381-1383. Manhattan Automotive, as an entity under common control with Manhattan Jeep, shares – or at least is alleged to share – joint and several liability for any statutory withdrawal liabilities owed by Manhattan Jeep.

The Fund's claim was the subject of a prior ruling by this Court that is set forth in a Bench Decision dated March 1, 2019. In that ruling, I noted that the Court had issued an order dated April 12, 2018 (the "Bar Date Order") that established May 23, 2018 as the deadline for the filing of proofs of claim. I then addressed the Fund's contention that its withdrawal liability claim was not subject to the Bar Date Order because the withdrawal liabilities were not even "claims" at the time of the bar date. I rejected that particular contention by the Fund. I noted that the definition of "claim" in the Bankruptcy Code includes any right to payment, "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). I then held that the Fund's withdrawal liability may have been subject to some contingencies as of the bar date, or may not have been fully matured or have been fully liquidated as of the bar date, but that it nevertheless was a "claim" as that term is defined in the Bankruptcy Code, and that it therefore was subject to the Bar Date Order. I also noted, however, that the Fund had asked me to excuse its failure to file a timely claim on grounds of excusable neglect. *See* Fed. R. Bankr. P. 9006(b). I noted that an evidentiary hearing would be needed on this issue, and that hearing was held this afternoon.

It appears that there is also one lingering legal issue that I need to dispose of. The original motion papers argued that there is an additional reason why the Bar Date Order did not apply to the Fund's claim: namely, that there was an exclusion in the Bar Date Order for claims that are based on the rejection of executory contracts. The Bar Date Order said that if a claim was based on the rejection of an executory contract, and if the contract had not been rejected as of the bar date, then the deadline for the filing of the claim would not occur until a date that the Court would set at the time the rejection of the relevant contract was approved. I thought, at our prior hearing, that the Fund had disclaimed reliance on this argument, but perhaps I was mistaken. The Fund asserted in the pre-trial order for today's hearing, and during the hearing today, that a collective bargaining agreement required Manhattan Jeep to participate in the multi-employer pension fund with respect to employees that were covered by that collective bargaining agreement; that the collective bargaining agreement has not been rejected; and that I should treat the withdrawal liability claim as a creature of a future contract rejection and therefore as a claim for which a deadline has not yet arrived.

At the hearing today, the Fund offered the testimony of Ms. Joann Emmons, the administrator of the Fund, regarding the Fund's knowledge of the bar date and the timing of the Fund's decision to file a proof of claim. Ms. Emmons freely acknowledged that she was aware of the bar date. In fact, the parties have stipulated in a pre-trial order that she received actual notice of the Bar Date Order. Ms. Emmons also acknowledged that the question of whether the bar date applied to a potential withdrawal liability was something that she actually discussed with the Fund's counsel.

The Fund also stipulated, and Ms. Emmons testified, that the reason the Fund did not file a proof of claim prior to the bar date was because the Fund did not believe that withdrawal

3

liability had accrued yet. In the pre-trial order, the Fund also says that it had concluded that it was not "reasonably foreseeable" that a withdrawal liability claim would accrue, which is a contention that I will address in a few moments.

As I noted earlier, the Fund has made legal arguments that the executory contract exclusions in the Bar Date Order should apply to the withdrawal liability claims. Ms. Emmons confirmed today, and the Fund confirmed today, that this was not the reason why the Fund delayed in filing a claim. More precisely, the Fund did not conclude or believe at the time that its filing was excused because withdrawal liability would represent a claim based on the rejection of an executory contract. Instead, the Fund decided not to file a claim because it had faith in the legal argument that I rejected a few weeks ago in the bench decision that I issued on March 1.

The trial record and the parties' stipulations, and the record of prior proceedings in this case (of which I take judicial notice) also establish the following facts.

The Chapter 11 petitions were filed on March 9, 2018. Ms. Emmons acknowledged that the fund was aware of the existence of the bankruptcy case and that the Fund's attorneys were responsible for the monitoring of developments in the case that might affect the Fund and its interests. The Debtors made quite clear in the motion papers they filed at the very outset of this case that their intent was to sell all or substantially all of their assets and to terminate their own business operations.

The Court issued the Bar Date Order on April 12, 2018. It stated that any person or entity who wished to assert a claim, as the term "claim" is defined in Section 101(5) of the Bankruptcy Code, was required to do so on or before May 23, 2018. In that regard, the notice referred explicitly to the statutory definition of "claim" in defining the claims that were subject to the bar date deadline.

As noted above, the Fund received notice of the bar date, considered whether to file a claim based on potential withdrawal liability, discussed that point with counsel, and then decided not to file a claim because it did not believe it had to do so.

In August 2018, the debtors filed a motion seeking approval of an agreement to sell their assets. On September 7, 2018, the Court entered an order that approved a sale of substantially all of the Debtors' assets.

Subsequently, the Fund sent a notice dated September 19, 2018, signed by Ms. Emmons, in which the Fund asserted that, "[a]s of September 30, 2018, your company," meaning Manhattan Jeep, "has withdrawn from participation in the plan." Ms. Emmons testified that prior to sending this notice she had received confirmation from the Debtors that the last employee covered by the plan had been terminated and that the Debtors had no employees left. Manhattan Jeep had made contributions for the month of September, so the notice set September 30, 2018 as the date of Manhattan Jeep's withdrawal from participation in the Fund. There were no reservations expressed about this, and no doubts about the withdrawal were expressed. The notice reflected a recognition by the Fund that the Debtors no longer had employees who were covered, that the Debtors had ceased operations, and that as a statutory matter, their participation in the Fund had ended.

At the hearing today, Ms. Emmons testified that she did not really know whether a withdrawal liability had been incurred as of September 2018. In support of that testimony, she said that it was possible that the Debtors might have resumed operations, or that somebody might have assumed the collective bargaining agreement obligations in some way that might assist the Debtors, or that some other thing might have happened that, in theory, might have negated or changed the withdrawal liability.

It is true that there were speculative and highly unlikely events that might have occurred after September 2018 and that might have affected the withdrawal liability. However, the notion that this means that the Fund and Ms. Emmons did not even know whether a withdrawal liability had accrued is a conclusory characterization of this situation that I find to be inaccurate and not credible. At other times in her testimony, Ms. Emmons acknowledged that the Fund did know, and had concluded, that the withdrawal liability was fully triggered in September 2018. Nobody thought that the events were going to change or that the withdrawal liability was going to be canceled or annulled, however remotely speculative a possibility might have existed that such a thing could have occurred. The testimony today, and the wording of the letters in evidence, make clear that the Fund actually concluded that the withdrawal liability had accrued and was fully triggered no later than September 2018.

On November 15, 2018, the Fund sent a notice to the Debtors stating that the Fund's actuaries had calculated the amount of the Debtors' withdrawal liability. The parties have stipulated that the original notice was returned to the Fund on or about December 26, 2018, marked for some reason as unclaimed. This notice, too, reflects the Fund's conclusion that a withdrawal liability was not merely possible but had already been triggered and that the Fund, if it had a claim, needed to take action to pursue it.

However, it was not until January 30, 2019 that the Fund filed proposed proofs of claim based on the alleged withdrawal liabilities. The proofs of claim asserted that the debtors jointly owe a withdrawal liability of $421,899, which would be payable in eighty quarterly installments of $4,302 each. (The quarterly payment calculations were made on the assumption that the Fund would earn a certain rate of return on each payment over time.) Also on January 30, 2019, the

6

Fund filed a motion asking the Court either to confirm that the bar date did not apply to these claims or, alternatively, to grant relief from the Bar Date Order on grounds of excusable neglect.

I will now turn to the question of whether relief from the operation of the bar date should be granted on grounds of excusable neglect.

Rule 9006 of the Federal Rules of Bankruptcy Procedure states that if an order of the court requires an action to be taken on or before a particular date, and if the action is not taken by the specified deadline, the court nevertheless may extend the deadline after the fact, and may permit the act to be done belatedly, "where the failure to act was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1)(2).

The leading decision on the application of "excusable neglect" standards is the decision of the United States Supreme Court in *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993). In *Pioneer*, an attorney filed a claim twenty days after the bar date. He claimed that he had been experiencing a major and significant disruption in his life due to his withdrawal from his former law firm, and that he was unaware of the bar date until after the bar date had passed. The Supreme Court held that the wording of Rule 9006 shows that relief may be available even if a deadline is missed due to neglect, which includes instances in which deadlines are missed due to carelessness or inattentiveness. For this purpose, the term "neglect" encompasses "both simple, faultless omissions to act and, more commonly, omissions caused by carelessness." *Id.* at 388.

The Supreme Court also held that the determination of whether neglect is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395. The relevant factors include: (1) the danger of prejudice; (2) the length of the delay and its potential impact on proceedings; (3) the reason for the delay, including whether

it was in the reasonable control of the movant; and (4) whether the movant acted in good faith. *Id.* However, the Supreme Court rejected the argument that a party should not be held responsible for the excusable neglect of its counsel. *Id.* at 396-97

The Supreme Court then held that excusable neglect had been demonstrated in *Pioneer*. The Court gave little weight to the fact that counsel was allegedly experiencing upheaval in his law practice. *Id.* at 398. However, since the bar date notice in that case had been set forth in a notice of a creditor meeting without any indication in the title of the notice that indicated that the notice also included information about a bar date, the Supreme Court held that counsel's actual lack of knowledge of the bar date, coupled with a lack of prejudice and a demonstration of good faith, constituted excusable neglect. *Id.* at 398-99.

The Second Circuit has taken what it has called "a hard line" in applying the *Pioneer* factors. *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003). In *Silivanch*, the Second Circuit applied the Pioneer factors in determining whether an untimely filing of an appeal was due to excusable neglect. The court held that the third of the *Pioneer* factors – the reason for a delay and whether it was in the reasonable control of the movant – is to be given the most weight in determining whether excusable neglect has been shown. *Id.* at 366 n.7. The Second Circuit further instructed that if a deadline is clear and understood, but is missed anyway, "we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test." *Id.* at 366-67. The *Silivanch* decision was reaffirmed in *Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp)*, 419 F.3d 115, 134 (2d Cir. 2005), where the court rejected a request for relief from a bar date based on allegations of excusable neglect.

8

I will now apply to *Pioneer* factors to the facts of this case, and pursuant to the Second Circuit's instructions I will start first with the reason for delay and whether it was within the claimant's control.

During the prior hearing in this case, the Fund argued that under the Sixth Circuit's decision in *CPT Holdings, Inc. v. Indus. & Allied Emps. Union Pension Plan, Local 73*, 162 F.3d 405, 409 (6th Cir. 1998), the Fund believed that the Bar Date Order did not apply to the withdrawal liability claim. It seems clear from the record before me today that this was not only the argument made at the prior hearing, but that it was the actual reason why the Fund decided in early 2018 that it did not need to file a withdrawal liability claim prior to the bar date. However, I have already rejected that argument and have held that if this is what the Fund believed, its belief was in error.

It also should have been clear to the Fund and its counsel that other courts had reached conclusions about withdrawal liability claims that differed from those set forth in the *CPT* decision. *See, e.g., In re CD Realty Partners*, 205 B.R. 651, 658-59 (Bankr. D. Mass. 1997); *see also In re Crane Rental Co.*, 334 22 B.R. 73, 76-77 (Bankr. D. Mass. 2005). It therefore ought to have been clear to the Fund and its attorneys that reliance on the *CPT* decision was a risky thing to do. In fact, it is difficult to understand why the Fund elected to take that risk. Even if the Fund believed that it had an argument that it was not legally required to file a claim, that hardly means that the Fund was barred from doing so. Certainly prudence should have dictated that the Fund act promptly so as to ensure that its rights were protected. Instead, the Fund elected to stake its fortunes on its legal conclusions as to whether withdrawal liability was subject to the Bar Date Order, and to take the risk that that its legal conclusion might be wrong.

To the extent that the Fund decided to puts its faith in a mistaken legal conclusion, that conduct does not constitute excusable neglect. *See In re Motors Liquidation Co.*, 576 B.R. 761, 778-79 (Bankr. S.D.N.Y. 2017) (holding that a claimant who did not file a claim because he believed his claim had not accrued made a mistake of law that did not constitute excusable neglect); *see also Canfield v. Van Atta Buick/GMC Truck Inc.*, 127 F.3d 248, 251 (2d Cir. 1997) (holding that, as a general matter, a mistake of law does not constitute excusable neglect.)

The Fund also argued today that the triggering of withdrawal liability in this case was such a remote prospect that the lack of a timely filing should be excused. If, in fact, the accrual of a withdrawal liability had truly been an extremely remote possibility -- so remote that it would not even have occurred to a reasonable person at the time that the liability might come to fruition – then perhaps that remoteness could support an argument that the party's failure to file a claim was excusable under the circumstances. But that is not the situation in this case.

It was clear from the outset of these cases that the Debtors' assets would be sold and that the Debtors themselves would cease to function. The termination of their operations was not merely a speculative possibility. Instead, their planned termination was openly trumpeted throughout the case.

The Fund argues that the withdrawal had not actually occurred as of the bar date, but it had to be clear to anyone paying attention that the withdrawal was coming. In fact, it was clear enough to prompt a conversation between Ms. Emmons and counsel about the withdrawal liability and whether a proof of claim should be filed. This is not a situation where the possible liability was so remote that the liability did not even register in the minds of the Fund's employees as a liability that might exist. Instead, the prospect of withdrawal liability was clear enough that it led to a specific conversation between Ms. Emmons and counsel.

10

The Fund argues that it is possible that certain things might have happened that might have negated a withdrawal liability, such for example, as the possibility that the Debtors might resume selling cars in Manhattan. But the Debtors made clear that they had no intent of doing any such thing.

The Fund asks me to find that the withdrawal liability was not "reasonably foreseeable" and was so speculative that the Fund should not have reasonably expected it to be triggered. But the evidence shows that it was extraordinarily likely that the withdrawal liability was going to be triggered – almost to the point of absolute certainty -- and that there was only the most infinitesimal and speculative of chances that the withdrawal liability would somehow be negated or avoided. In other words, withdrawal liability was not only reasonably foreseeable, it was extremely likely and almost a dead certainty.

The Fund also argues in its papers that there might not have been any withdrawal liability if the Fund had been fully funded at the time of the withdrawal. But the facts about this plainly were known to the Fund at the time the Fund received notice of the bar date, and Ms. Emmons conceded in her testimony today that she knew at the time of the bar date that the Fund was not fully funded. Certainly there was no real chance that this was going to change, or at least no evidence was offered to suggest that it might. Accordingly, the Fund's argument that a filing should be excused on the theory that the Fund should not have anticipated that it might be in an underfunded state in the future, when the Fund admittedly knew that it already was in an underfunded state, is without merit.

At most, the Fund's arguments suggest that a withdrawal liability was not fully matured and liquidated at the time of the bar date and perhaps that there were very slight contingencies as to whether the liability would be triggered or negated. But claims are still claims regardless of

11

whether there are contingencies and regardless of whether the claims are fully matured and liquidated. This particular claim was not a remote one. Instead, it was a claim whose accrual was nearly certain. The failure to file a claim cannot be excused on the theory that withdrawal liability did not give rise to a claim, and it also cannot be excused based on contentions that the Fund somehow reasonably thought that the claim was unlikely to mature.

On the first factor, then, which is the one that the Second Circuit has said must be given the most significance, I do not find that any circumstances exist that reasonably excuse the Fund's delay. On that ground alone, under the existing case law, the Fund's motion should be denied, but for completeness I will review the other factors as well.

Another factor to be considered is whether it would be prejudicial to allow the late filing of the claim. The Debtors argue that there would be prejudice because the claim is a large one. I think that in this particular regard the size of the claim is not the only factor, although it is a relevant factor. The main prejudice to be considered needs to focus on whether the timing of the claim and the lateness of the claim, rather than just the amount of the claim, is prejudicial. It can certainly be the case that the belated filing of a very large claim may be more prejudicial than the belated filing of an extremely small claim, but the inquiry still needs to focus on prejudice caused by the timing and not just by the amount of the claim in the abstract.

Here, we are very far along in the progress of these cases. The debtors have proposed a plan of reorganization. Other creditors have waited a long time for payments on their claims. The belated filing of this claim just results in potential delays that could have been avoided if a more timely claim had been filed and if the many complicated issues raised by withdrawal liability calculations had been posed earlier. The facts do not present the most desperate case of prejudice that I have ever seen in a bankruptcy case, but there is some prejudice here, and that

prejudice, when combined with the lack of a reasonable excuse for the late filing, just underscores the lack of excusable neglect.

Another factor is the length of delay and the potential impact on the proceedings. Here, the Fund itself took the position in September that withdrawal liability had accrued. It even quantified that liability in November. But it did not file a proof of claim in September or in November. More than four months passed between the date of the September 2018 notice about the existence of the withdrawal liability and the January 30, 2019 filing of the proposed proofs of claim and of the motion that is now before me. The original Bar Date Order gave creditors about six weeks to file claims. The Fund took far longer than that, even if its timeliness were to be measured from the time when its own correspondence shows that it knew a liability had accrued.

As I have already said, there is a potential impact on the proceedings in this case in the sense that issues that might have been addressed earlier will now potentially result in further delays that would adversely affect other creditors. But in addition, the timeliness of the request is a factor in assessing the equity of the request. A person who wishes to obtain relief on grounds of excusable neglect ought to act promptly in seeking that relief. The Fund did not do so here. *See, e.g., In re AMR Corp.*, 492 B.R. 660, 667 (Bankr. S.D.N.Y. 2013 (holding that a three-month delay was an unreasonable one in applying the *Pioneer* factors.)

The final factor to be considered is whether the claimant acted in good faith. I do not find any lack of good faith here. I do find a failure to act with the reasonable diligence and speed that equity required under the circumstances, but I do not find a lack of good faith.

For the foregoing reasons and after fully considering all of the relevant factors, I find that the Fund has failed to establish excusable neglect, and therefore I will not extend the bar date to permit a late filing of the Fund's withdrawal liability claims.

As noted above, I also should address, for completeness, the Fund's argument that its filing was excused on the theory that the Bar Date Order made an exception for claims that are based on the rejection of executory contracts. The Fund itself acknowledged during prior arguments in this court that a withdrawal liability is triggered as a matter of statute whenever there is a permanent cessation of operations or a termination of the participant's obligations to contribute to the plan. It was quite plain during the discussions at the prior hearings that withdrawal liability was not conditioned upon the rejection of a collective bargaining agreement. In fact, the Fund itself has previously taken the position in its correspondence that it was the sale of assets, the termination of the debtors' ongoing operations, and the termination of employment of its employees that triggered the withdrawal liability.

Furthermore, there is no evidence that the Fund ever thought of the withdrawal liability as one that would be tied to the rejection of an executory contract. That is not the actual reason why the Fund delayed in filing a claim. It is instead just an argument that counsel has seized upon to try to justify the Fund's failure to act, even though it was not the reason why the Fund failed to act.

As a matter of law, the withdrawal liability is statutory and is not based on the rejection or assumption of a contract. There is no evidence that the Fund ever thought otherwise and no contention that the fund had a mistaken belief or any belief that executory contract theories would warrant a delay in filing a claim or provide an exception to the bar date.

I therefore reject the contention that the executory contract exception in the Bar Date Order excused the late filing of the withdrawal liability claim or that the executory contract language provides any basis for an excusable neglect claim.

Finally, the Fund has argued in the pretrial order, and at the hearing today, that I should provide the Fund with the equivalent of a subordinated claim that would have the result of giving the Fund a claim that would have the same standing, in effect, as a late-filed claim would have in a Chapter 7 liquidation.

The Bankruptcy Code provides that claims are allowed or disallowed. Rule 3003 of the Federal Rules of Bankruptcy Procedure, which governs the filing of claims in Chapter 11 cases, says that if a timely claim is not filed, then the creditor "shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution." I therefore am not sure I understand just how I could allow the claim in a form that the Fund has requested. But I do not need to rule on this issue today and I will not do so. The issue was not raised in the original motion papers; it appeared for the first time in the joint pre-trial order that I received yesterday. If the Fund believes that the terms of the proposed plans of reorganization in these cases somehow do not meet the requirements of Chapter 11, and that its late-filed claim still gives it some standing to object, then it may object to the plans, and I will rule on those objections when confirmation is sought.

A separate Order will be entered to reflect the foregoing rulings.

Dated: New York, New York
      April 3, 2019

      **s/Michael E. Wiles**
      Hon. Michael E. Wiles
      United States Bankruptcy Judge